**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

GIOVANNI R. NUNEZ,

                                        Plaintiff,

                    -against-

KILOLO KIJAKAZI,
Acting Commissioner of Social Security

                                        Defendant.

-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____
```

21-cv-02311 (VF)

<u>**OPINION & ORDER**</u>

**VALERIE FIGUEREDO, United States Magistrate Judge**

      Plaintiff Giovanni R. Nunez seeks judicial review of a final determination by Defendant, the Acting Commissioner ("Commissioner") of the Social Security Administration ("SSA")[1], denying Nunez's application for Supplemental Security Income benefits under Title XVI of the Social Security Act (the "Act"). Before the Court is Nunez's motion for judgment on the pleadings and the Commissioner's cross-motion for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. For the reasons set forth below, Nunez's motion is **DENIED**, and the Commissioner's cross-motion is **GRANTED**.

---

[1] On July 9, 2021, Kilolo Kijakazi became Acting Commissioner of the SSA, and is therefore substituted as the named defendant. See Fed. R. Civ. P. 25(d) (permitting automatic substitution of a party who is a public official sued in her official capacity when the public official "ceases to hold office" while a suit is pending).

**BACKGROUND**

**A.  Procedural History**

On September 13, 2018, Nunez completed his application for Supplemental Security

Income benefits ("SSI") and Disability Insurance benefits ("DIB"), alleging August 22, 2018 as the

onset date of his disability. SSA Administrative Record ("R.") at 169-80, ECF No. 16. When

Nunez applied for SSI and DIB, he alleged disability based on agoraphobia, panic disorder, vertigo,

anxiety disorder, and learning disability. Id. at 204. Nunez's claims for SSI and DIB were initially

denied on December 24, 2018, id. at 103-10, and on December 27, 2018, Nunez filed a written

request for a hearing before an administrative law judge, id. at 111-12.

On August 14, 2019, Nunez and his counsel, Renee Moore, appeared before Administrative

Law Judge Angela Banks (hereinafter, the "ALJ") at a hearing in the Bronx, New York. Id. at 40-

70. On November 14, 2019, the ALJ issued her written decision, finding that Nunez has not been

under a disability within the meaning of the Act from August 22, 2018, through the date of her

decision. Id. at 19-33. Nunez requested a review of the ALJ's decision by the SSA Appeals Council

on December 20, 2019, which was denied on January 14, 2021. Id. at 166-68, 1-7. That denial

made the November 14, 2019 decision of the ALJ the final action of the Commissioner. See

Lesterhuis v. Colvin, 805 F.3d 83, 87 (2d Cir. 2015) (per curiam) ("If the Appeals Council denies

review of a case, the ALJ's decision, and not the Appeals Council's, is the final agency decision.")

(citation omitted).

On March 16, 2021, after exhausting his administrative remedies, Nunez

commenced the instant action seeking judicial review of the ALJ's decision, and requesting that

this Court modify the decision and grant Nunez SSI payments as allowed under the Act.[2] See

---

[2] Although Nunez applied for both SSI and DIB, Nunez challenges only the
Commissioner's denial of SSI benefits. See Complaint, ¶ c, ECF No. 1.

Complaint, ECF No. 1. On September 27, 2021, the Commissioner filed the Administrative

Record, which constituted her answer. ECF No. 16. Thereafter, on January 25, 2022, Nunez moved

for judgment on the pleadings and submitted a memorandum of law in support of his motion,

requesting that the Court reverse the ALJ's decision or remand for further proceedings. ECF Nos.

19-20. On May 27, 2022, the Commissioner submitted her opposition and a cross-motion for

judgment on the pleadings. ECF Nos. 26-27. Nunez filed a reply to the Commissioner's opposition

and cross-motion on June 7, 2022. ECF No. 28.

**B. <u>Medical Evidence</u>**

The parties' memoranda in support of their motions for judgment on the pleadings

provide summaries of the medical evidence contained in the administrative record. <u>See</u> Pl.'s

Br. at 1-10, ECF No. 20; Def.'s Br. at 4-12, EFC No. 27. Having examined the record, the

Court concludes that the parties have accurately stated its contents. Although the parties focus

on different aspects of the record at times, there are no inconsistencies in the parties'

recounting of the medical evidence. Moreover, no party has objected to the other's summary of

the medical evidence. The Court therefore adopts the parties' summaries as complete for the

purposes of the issues raised in this action. <u>See</u> <u>Collado v. Kijakazi</u>, No. 20-CV-11112 (JLC),

2022 WL 1960612, at *2 (S.D.N.Y. June 6, 2022) (adopting parties' summaries of medical

evidence where parties did not dispute recitation of relevant facts); <u>Scully v. Berryhill</u>, 282 F.

Supp. 3d 628, 631 (S.D.N.Y. 2017) (adopting parties' summaries where they were

"substantially consistent with each other" and neither party objected to the opposing party's

summary). The medical evidence in the record is discussed below to the extent necessary to

address the issues raised in the pending cross-motions.

**DISCUSSION**

**A.  Legal Standards**

    1.  Judgment on the Pleadings

A Rule 12(c) motion for judgment on the pleadings is evaluated under the same standard as a Rule 12(b)(6) motion to dismiss. Bank of N.Y. v. First Millennium, Inc., 607 F.3d 905, 922 (2d Cir. 2010). Thus, "[t]o survive a Rule 12(c) motion, the complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Id. (internal quotation marks and citation omitted).

    2.  Judicial Review of the Commissioner's Decision

An individual may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard." Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

Substantial evidence is "more than a mere scintilla." Richardson v. Perales, 402 U.S. 389, 407 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 374-75; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (citation and internal quotation marks omitted). "Under the substantial-evidence standard, a court looks to an existing

administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations . . . whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." Id. (citation omitted). In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." Selian, 708 F.3d at 417 (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curium)).

The substantial evidence standard is a "very deferential standard of review." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012). The Court "must be careful not to substitute its own judgment for that of the Commissioner, even if it might justifiably have reached a different result upon a *de novo* review." DeJesus v. Astrue, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations omitted). "[O]nce an ALJ finds facts, [a court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'" Brault, 683 F.3d at 448 (quoting Warren v. Shalala, 29 F.3d 1287, 1290 (8th Cir. 1994)) (emphasis omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted); see also Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008).

   3.   Commissioner's Determination of Disability

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A).

Physical or mental impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); see id. § 1382c(a)(3)(B). In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'" Mongeur, 722 F.2d at 1037 (quoting Gold v. Sec'y of H.E.W., 463 F.2d 38, 41 (2d Cir. 1972)). The Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Id. (citations omitted); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

<u>Five-Step Inquiry</u>

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" Estrella v. Berryhill, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 416.920(a)(4). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. § 416.920(a)(4)(i). Second, if the claimant is unemployed, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," id. § 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," id. § 416.920(c). Third, if the claimant has such an impairment, the Commissioner considers whether the medical severity of

the impairment "meets or equals" a listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. <u>See</u> <u>id.</u> §
416.920(a)(4)(iii), 416.920(d). If so, the claimant is considered disabled. <u>Id.</u>

If the claimant alleges a mental impairment, the Commissioner must apply a "special
technique" to determine the severity of the claimant's impairment at step two, and to determine
whether the impairment satisfies Social Security regulations at step three. <u>See</u> 20 C.F.R §
416.920a; <u>see also</u> <u>Kohler v. Astrue</u>, 546 F.3d 260, 265 (2d Cir. 2008). "If the claimant is found to
have a 'medically determinable mental impairment,' the [Commissioner] must 'specify the
symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s),' then
'rate the degree of functional limitation resulting from the impairment(s) in accordance with
paragraph (c) of [Section 416.920a],' which specifies four broad functional areas: (1) activities of
daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of
decompensation." <u>Velasquez v. Kijakazi</u>, No. 19-CV-9303 (DF), 2021 WL 4392986, at *18
(S.D.N.Y. Sept. 24, 2021) (quoting 20 C.F.R. §§ 416.920a(b), (c)(3)). "The functional limitations
for these first three areas are rated on a five-point scale of none, mild, moderate, marked, or
extreme, and the limitation in the fourth area (episodes of decompensation) is rated on a four-point
scaled of none, one or two, three, or four or more." <u>Id.</u> (internal quotations, alterations, and
citations omitted).

Fourth, if the claimant's impairment does not meet or equal a listed impairment, the
Commissioner continues to the fourth step and determines whether the claimant has the residual
functional capacity ("RFC") to perform his or her past relevant work. 20 C.F.R. §
416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. <u>Id.</u> §
416.920(a)(4)(iv). Finally, if the claimant is unable to perform past relevant work, the
Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work

experience, permits the claimant to do other work. Id. § 416.920(a)(4)(v). If the claimant cannot

perform other work, he or she will be deemed disabled. Id. § 416.920(a)(4)(v).

The claimant has the burden at the first four steps. Burgess, 537 F.3d at 128. If the claimant

is successful, the burden shifts to the Commissioner at the fifth and final step, where the

Commissioner must establish that the claimant has the ability to perform some work in the national

economy. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in determining

whether a claimant is disabled under the [Social Security] Act." Pena ex rel. E.R. v. Astrue, No.

11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y. Mar. 25, 2013) (citing 20 C.F.R. §

416.927(d)) (internal quotation marks omitted). For SSI applications filed before March 27, 2017,

the SSA's regulations required application of the "treating physician rule," which required an ALJ

to give more weight to the opinions of physicians with the most significant relationship with the

claimant. See 20 C.F.R. § 416.927(d)(2); see also Taylor v. Barnhart, 117 F. App'x 139, 140 (2d

Cir. 2004). Under the treating physician rule, an ALJ was required to provide her reasoning if she

determined that a treating physician's opinion was not entitled to "controlling weight," or at least

"more weight," than the opinions of non-treating and non-examining sources. Gonzalez v. Apfel,

113 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2000). In addition, under the treating physician rule, a

consultative physician's opinion was generally entitled to "little weight." Giddings v. Astrue, 333

F. App'x 649, 652 (2d Cir. 2009).

On January 18, 2017, the SSA published comprehensive revisions to the regulations

regarding the evaluation of medical evidence for applications filed on or after March 27, 2017

(such as Nunez's application in this case). See Revisions to the Rules Regarding the Evaluation of

Medical Evidence, 82 Fed. Reg. 5844, 5869-70, 2017 WL 168819 (Jan. 18, 2017). "In

implementing new regulations, the SSA has apparently sought to move away from a perceived

hierarchy of medical sources." Velasquez, 2021 WL 4392986, at *19 (citing 82 Fed. Reg. 5844).

The new regulations state that an ALJ need "not defer or give any specific evidentiary weight,

including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from [a claimant's] medical sources."[3] 20 C.F.R. §416.920c(a); see also Young v.

Kijakazi, No. 20-CV-03606 (SDA), 2021 WL 4148733, at *9 (S.D.N.Y. Sept. 13, 2021). Instead,

an ALJ must consider all medical opinions in the record and "evaluate the persuasiveness" based

on five "factors": (1) supportability; (2) consistency; (3) relationship with the claimant; (4)

specialization; and (5) any "other" factor that "tend[s] to support or contradict a medical opinion."

20 C.F.R. § 416.920c(a)-(c).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's duty to

articulate a rationale for each factor varies. 20 C.F.R. § 416.1520c(a)-(b). Under the new

regulations, the ALJ must "explain," in all cases, "how [she] considered" both the supportability

and consistency factors, as they are "the most important factors." Id. § 416.920c(b)(2); see also

Young, 2021 WL 4148733, at *9 (describing supportability and consistency as "the most

important" of the five factors); Amber H. v. Saul, No. 3:20-CV-490 (ATB), 2021 WL 2076219, at

*4 (N.D.N.Y. May 24, 2021) (noting that the two "most important factors for determining the

persuasiveness of medical opinions are consistency and supportability," the "same factors" that

---

[3] The new regulations define "prior administrative medical finding" as: a "finding, other
than the ultimate determination about whether you are disabled, about a medical issue made by our
Federal and State agency medical and psychological consultants at a prior level of review (see §
416.1400) in your current claim based on their review of the evidence in your case record,
including but not limited to: (i) The existence and severity of your impairment(s); (ii) The existence
and severity of your symptoms; (iii) Statements about whether your impairment(s) meets or
medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1; (iv)
If you are an adult, your [RFC]; (v) Whether your impairment(s) meets the duration requirement;
and (vi) How failure to follow prescribed treatment (see § 416.930) and drug addiction and
alcoholism (see § 416.935) relate to your claim." 20 C.F.R. § 416.913(a)(5).

formed the foundation of the treating physician rule). With respect to the supportability factor, "the strength of a medical opinion increases as the relevance of the objective medical evidence and explanations presented by the medical source increase." Vellone v. Saul, No. 20-CV-261 (RA) (KHP), 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. § 416.920c(c)(1)); see Rivera, 2020 WL 8167136, at *16 (noting that supportability "has to do with the fit between the medical opinion offered by the source and the underlying evidence and explanations 'presented' by that source to support [his or] her opinion") (quoting 20 C.F.R. § 416.920c(c)(1)). Consistency, on the other hand, "is an all-encompassing inquiry focused on how well a medical source is supported, or not supported, by the entire record." Vellone, 2021 WL 319354, at *6 (citing 20 C.F.R. § 416.920c(c)(2)).

As to the three remaining factors—relationship with the claimant, specialization, and "other"—the ALJ is required to consider, but need not explicitly discuss, them in determining the persuasiveness of the opinion of a medical source. 20 C.F.R. § 416.920c(b)(2). If the ALJ finds two or more medical opinions to be equally supported and consistent with the record, but not identical, the ALJ must articulate how she considered the three remaining factors. See id. § 416.920c(b)(3); see also Velasquez, 2021 WL 4392986, at *20. Thus, "[a]lthough the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning 'weight' to a medication opinion, the ALJ must still 'articulate how [she] considered the medical opinions' and 'how persuasive [she] find[s] all of the medical opinions.'" Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) (citations omitted). "If the ALJ fails adequately to 'explain the supportability or consistency factors,' or bases [his] explanation upon a misreading of the record, remand is required." Rivera, 2020 WL 8167136, at *14 (quoting Andrew G., 2020 WL 5848776, at *9).

Courts considering the application of the new regulations have concluded that "the factors are very similar to the analysis under the old [treating physician] rule." <u>Velasquez</u>, 2021 WL 4392986, at *20 (quoting <u>Dany Z. v. Saul</u>, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); <u>see also</u> <u>Acosta Cuevas v. Comm'r of Soc. Sec.</u>, No. 20-CV-502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (collecting cases considering the new regulations and concluding that "the essence" of the treating physician rule "remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar"), <u>report and recommendation adopted by</u>, 2022 WL 717612 (Mar. 10, 2022). "This is not surprising considering that, under the old rule, an ALJ had to determine whether a treating physician's opinion was supported by well-accepted medical evidence and not inconsistent with the rest of the record before controlling weight could be assigned." <u>Acosta Cuevas</u>, 2021 WL 363682, at *9; <u>see also e.g.</u>, <u>Andrew G.</u>, 2020 WL 5848776, at *5 (noting that "consistency and supportability" were the foundation of the treating physician rule).

<u>Claimant's Credibility</u>

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. <u>Osorio v. Barnhart</u>, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints.'" <u>Id.</u> (quoting <u>Aponte v. Sec'y of Health and Hum. Servs.</u>, 728 F.2d 588, 591 (2d Cir. 1984)) (first alteration in original). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." <u>Pena v. Astrue</u>, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *10 (S.D.N.Y. Dec. 3, 2008) (quoting <u>Williams v. Bowen</u>, 859 F.2d 255, 260-61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination

'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" Id. (quoting Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. Genier, 606 F.3d at 49 (2d Cir. 2010). The ALJ must follow a two-step framework for evaluating allegations of pain and other limitations. Id. First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. Id.; see also 20 C.F.R. § 416.929(b). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." Id. (quotation omitted); see also 20 C.F.R. § 416.929(a). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (*e.g.*, lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

Pena, 2008 WL 5111317, at *11 (citing Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

**B.  The ALJ's Decision**

On November 14, 2019, the ALJ issued her decision, R. at 19-33, finding that Nunez was not disabled under the Act. Id. at 33. The ALJ began by explaining the five-step process for determining whether an individual is disabled. Id. at 23-24.

At step one, the ALJ found that Nunez had not engaged in substantial gainful activity since August 22, 2018. Id. at 25. At step two, the ALJ found that Nunez had three severe impairments: (1) asthma, (2) agoraphobia with panic disorder, and (3) generalized anxiety behavior.[4] Id. The ALJ also noted Nunez's non-severe impairments: headaches, vertigo, and gastroesophageal reflux disease. Id.

At step three, the ALJ found that Nunez "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, subpart P, Appendix 1 (20 CFR 404.1520(a), 404.1525, 404.1426, 416.920(d), 416.925 and 416.926)." Id. at 25-27. In assessing Nunez's mental impairments, the ALJ applied evidence in the record to each of the "four broad functional areas" (known as "paragraph B" criteria), including: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. Id. at 26-27. The ALJ concluded that Nunez's mental impairments caused moderate limitations in the functional areas of: (1) understanding, remembering or applying information; (2) interacting with others; and (3) concentrating, persisting, or maintaining pace. Id. The ALJ also determined that Nunez's mental impairments caused mild limitations in the functional area of adapting or managing oneself. Id. at 26. The ALJ concluded that because Nunez's "mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." Id. at 27. Additionally, the ALJ concluded that Nunez "does not meet the 'paragraph C' criteria of listing 12.04 and 12.06," because "[t]he record fails to demonstrate a medically documented history of the existence of a serious and persistent mental health disorder over a period of at least 2 years, along

---

[4]In his motion, Nunez does not dispute the ALJ's findings related to his physical impairments. He challenges only the ALJ's findings pertaining to his mental impairments. Pl.'s Br. at 1 n. 5. Therefore, the Court does not address the ALJ's findings concerning Plaintiff's asthma.

with evidence of medical treatment, mental health therapy, psychosocial support, or a highly

structured setting that is ongoing and that diminishes the symptoms and signs of the mental

disorder." Id. Further, the ALJ found that "there is no evidence of a marginal adjustment, that is,

minimal capacity to adapt to changes in the environment or to demands that are not already part of

the daily life." Id.

Before proceeding to step four, the ALJ found, "[a]fter careful consideration of the entire

record," that Nunez maintained the RFC "to perform a full range of work at all exertional levels but

with" certain non-exertional limitations. Id. Specifically, the ALJ found that Nunez "cannot operate

a motor vehicle as an occupational requirement, nor work at unprotected eights or around moving

mechanical parts"; Nunez can perform "work that requires him to understand, remember, and carry

out instructions consistent with occupations that can be learned in up to 30 days"; Nunez "requires

a setting that is goal-oriented versus requiring that he maintain a specific pace consistent

throughout the day"; and Nunez "can tolerate occasional interaction with the public, and remains

able to interact appropriately with supervisors and co-workers." Id.

In considering Nunez's symptoms, the ALJ followed the established two-step process: (1)

determining whether there was an underlying medically determinable physical or mental

impairment; and (2) if such an impairment was shown, evaluating the "intensity, persistence, and

limiting effects of the claimant's symptoms to determine the extent to which they limit the

claimant's functional limitations." Id. at 27-28. The ALJ analyzed Nunez's impairments, and after

considering the evidence, found that even though Nunez's "medically determinable impairments

could reasonably be expected to cause the alleged symptoms," Nunez's "statements concerning the

intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the

medical evidence and other evidence in the record." Id. at 28. The ALJ also independently

evaluated each of the medical opinions and prior administrative medical findings, and determined

whether each opinion was "persuasive," "partially persuasive," or "not persuasive." Id. at 29-31.

At step four, the ALJ found that Nunez was unable to perform the work of a security guard,

his past relevant work. Id. at 31. At step five, the ALJ considered Nunez's "age, education, work

experience, and [RFC]," and found that "there [were] jobs that exist in significant numbers in the

national economy that [Nunez] can perform." Id. at 32. Based on testimony from a vocational

expert ("VE") and in conjunction with the Medical-Vocational Guidelines, the ALJ concluded that

Nunez was "not disabled" because he could perform a limited range of light work and was

"capable of making a successful adjustment to other work that exists in significant numbers in the

national economy." Id. The ALJ cited the VE's testimony that given Nunez's age, education, work

experience and RFC, such an individual would be able to perform work as a: (1) final assembler

(DOT No. 789.687-046); (2) packager (DOT 559.687-074); and (3) product assembler (DOT No.

739.687-030).[5] Id. Accordingly, the ALJ concluded that Nunez "has not been under a disability"

within the meaning of the Act "from August 22, 2018," the alleged onset date, "through the date of

[the] decision." Id. (citing 20 CFR 404.1520(g) and 416.920(g)).

C. **Analysis**

Nunez attacks the ALJ's determination on three grounds. Nunez asserts that the ALJ failed

to properly: (1) evaluate the medical opinion evidence; (2) determine Nunez's RFC; and (3)

evaluate Nunez's subjective complaints about his symptoms. Pl.'s Br. at 11-25. For the reasons

explained below, the ALJ properly evaluated both the medical opinion evidence and Nunez's

subjective complaints. Further, substantial evidence supports the ALJ's determination that Nunez's

medically determinable impairments, although severe, do not prevent him from performing work,

---

[5] The ALJ also noted that she found the VE's testimony to be "consistent with the information contained in the Dictionary of Occupational Titles." R. at 32.

with limitations as identified by the VE, and thus do not render him disabled under the Act. Accordingly, the Commissioner's cross-motion for judgment on the pleadings is granted and the ALJ's decision is affirmed.

    1.  <u>The ALJ properly evaluated the medical opinions of Drs. Schulte, Bromley, and Ellis.</u>

In her assessment of the medical evidence, the ALJ determined that the medical opinions of treating psychiatrist and therapist Patrick Schulte, M.D., and examining psychologists Glenn Bromley, Ph.D. and James K. Ellis, Ph.D. were not persuasive. R. at 30-31. Nunez asserts that the ALJ erred because she failed "to consider evidence related to the supportability and consistency of the assessments from [Drs. Schulte, Bromley, and Ellis]." Pl.'s Br. at 15. The Commissioner counters that "the ALJ weighed the medical opinions in accordance with the Commissioner's regulations, and articulated substantial evidence in support of the . . . credibility findings." Def.'s Br. at 21. For the reasons set forth below, the ALJ properly considered evidence relating to the supportability and consistency of the findings of Drs. Schulte, Bromley, and Ellis, and sufficiently explained her findings.

Because Nunez's application was filed after March 27, 2017, the ALJ must consider the medical opinions in the record based on the following five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) any "other" factor that "tend[s] to support or contradict a medical opinion." 20 C.F.R. § 416.920c(a)-(c). Although the ALJ must "consider" all these factors, under the new regulations the ALJ must only "explain" how she considered the "most important factors" of supportability and consistency. 20 C.F.R. §§ 416.1520c(a)-(b), (b)(2). Nunez argues that the ALJ failed to do exactly that with regard to the medical opinions of Drs. Schulte, Bromley, and Ellis. Pl.'s Br. at 19. Nunez is mistaken. A review of the ALJ's decision demonstrates that she considered the relevant evidence and discussed the

supportability and consistency factors when weighing the opinions of Drs. Schulte, Bromley, and Ellis, explicitly outlining why she found each opinion more or less persuasive. R. at 28-31. The ALJ articulated how the opinions of Drs. Schulte, Bromley, and Ellis were not supported by or consistent with underlying medical evidence in the record, including cites to each doctor's own treatment notes and mental examinations of Nunez. Id. Further, substantial evidence in the underlying record supports the ALJ's determinations as to those medical opinions.

Beginning with Dr. Schulte, the ALJ properly found that Dr. Schulte's opinions regarding Nunez's inability to work and limited ability to adapt to, and use, public transportation, were not persuasive. Id. at 30. Dr. Schulte opined that Nunez was unable to work because of his panic attacks. Id. at 406, 722. Dr. Schulte rendered that opinion on November 27, 2018, and again on June 11, 2019. Id. Prior to that, Dr. Schulte had been treating Nunez for his panic disorder since November 2016. Id. at 309. In May 2018, Nunez started to experience a reemergence of panic attacks that were previously stable. Id. at 298. Dr. Schulte reported that Nunez had been taking the prescription medication Lexapro, but was in the midst of a "taper off" of the medication when his panic attacks reemerged. Id. However, Dr. Schulte's treatment notes after June 2018, when Nunez started taking Lexapro again, demonstrate that Nunez's condition stabilized and improved with treatment and medication. Id.

For example, in a September 2018 examination, Dr. Schulte reported that Nunez was less anxious and appeared calm and cooperative. Id. Nunez reported that he had been using various "cognitive behavioral techniques" that had been helpful in subsiding his panic-attack symptoms and residual anxiety. Id. at 298-99. Nunez also reported that he had continued to use the subway without experiencing symptoms of agoraphobia, and that he did not have any catastrophic or intrusive thoughts, or any manic or psychotic symptoms. Id. In October 2018, Nunez reported to Dr. Schulte that he began attending a weekly panic and anxiety therapy group and that his anxiety

had been "well-controlled." Id. at 346. Dr. Schulte reported that during that examination, Nunez

was "hyperventilating, [and] pacing around the office," but that he responded "well to grounding

exercise and deep breathing." Id. In November 2018, Nunez reported to Dr. Schulte that he

continued to attend weekly therapy meetings and that his anxiety had been "more manageable." Id.

at 335. Nunez also reported "having less catastrophic thinking," and was taking his medication

(Lexapro) with no adverse effects. Id. In December 2018, Dr. Schulte reported that Nunez had been

wholly compliant with the treatment recommendations and had started to incorporate "progressive

muscle relaxation," and "physical exercise and yoga," which had "been helpful for his anxiety." Id.

at 453.

In January 2019, Nunez reported to Dr. Schulte that his anxiety had continued to become

"more manageable." Id. at 421. Nunez indicated that he had continued to ride the subway more

often without company, but reported being fearful of the train and experiencing symptoms of

shortness of breath and tachycardia when in the subway station. Id. Dr. Schulte discussed with

Nunez ways he could continue to manage his anxiety while traveling alone on the subway, and

reported that Nunez responded well to "reframing" and "cognitive restructuring." Id. Dr. Schulte

also reported that Nunez had continued attending the weekly psychosocial group and that he

engaged in more physical exercise and yoga, which had been helpful in treating his anxiety. Id. at

422. In February 2019, Dr. Schulte reported that Nunez's objective mental-status examinations

revealed improved anxiety, less panic attacks, "calm" motor activity, "normal" speech, and "fair"

insight and judgment. Id. at 415. In April 2019, Nunez reported "interval improvement in anxiety,"

and stated that he had been keeping busy by visiting family and volunteering. Id. at 663. Dr.

Schulte reported that Nunez had continued doing "progressive muscle relaxation exercise and

visualization exercises" with "good effect" and that he continued to engage in physical exercise

and yoga, which continued to help treat his anxiety. Id. In May 2019, Nunez reported that he

continued with "progressive muscle relaxation and visualization exercises" with "good effect," in addition to attending the psychosocial group weekly and adhering to the Lexapro with no adverse effects. Id. at 657. By June 2019, Nunez continued with the Lexapro and he reported "improved management" of his anxiety to Dr. Schulte. Id. at 645-46. Nunez reported that he was able to manage panic-attack symptoms using the prescription medication Atarax. Id. at 645. Dr. Schulte reported that Nunez continued to stay busy with visiting family, volunteering, physical exercise, and yoga. Id. at 645-46.

As this discussion illustrates, Dr. Schulte's own treatment notes during a period of nearly a year demonstrate that Nunez's anxiety and panic attacks continuously improved with medication and other treatment regiments and had stabilized. By June 2019, Dr. Schulte's treatment notes indicate that Nunez was able to manage his anxiety and panic attacks, allowing him to leave his house, visit family, and engage in volunteer activities. R. at 645. For this reason, Dr. Schulte's opinion that Nunez was unable to work because of his panic attacks is not consistent with the medical evidence or supported by his own treatment notes, as the ALJ explained. Id. at 30. Instead, as the ALJ reasoned, the objective mental-status examinations by Dr. Schulte from September 2018 to June 2019 revealed continuous improvement in Nunez's anxiety and panic attacks and showed that Nunez's condition could be adequately managed with medication and treatment therapies. The ALJ discussed this evidence in her decision and articulated that the improvement in Nunez's condition, as reported by Dr. Schulte, did not support Dr. Schulte's finding that Nunez is unable to work due to the frequency of his panic attacks and depression. Id. The ALJ's determination adequately reflects that she considered the supportability and consistency of Dr. Schulte's medical opinion, as assessed against the rest of the evidence in the record.

Next, the ALJ also properly found that Dr. Bromley's finding of marked limitations was not persuasive. Id. The ALJ explained that Dr. Bromley's opinion that Nunez had marked limitations in

understanding, remembering, and applying complex directions and instructions, regulating

emotion, controlling behavior, and maintaining well-being were "not supported and consistent"

because "aside from some anxiety and panic attacks, [Nunez] was mentally stable." Id. Here, too,

the ALJ explained how she considered the supportability and consistency factors as it related to Dr.

Bromley's opinion.

Dr. Bromley examined Nunez once, in November 2018. Id. at 328-32. As the ALJ

recounted, Dr. Bromley's notes indicated that Nunez had "appropriate" grooming, motor activities,

and speech; despite some anxiety, he only had mildly impaired attention, concentration, and

memory. Id. at 329-330. During the consultative examination with Dr. Bromley, Nunez reported

feeling anxious and shaking, and Dr. Bromley recalled that Nunez had "borderline" intellectual

functioning. Id. at 330. However, Nunez reported that his medications helped his symptoms, and

Nunez also reported being able to dress, bathe, and groom himself, do basic cooking and food

preparation, clean and shop by himself, and manage his own money. Id. at 329, 331. Nunez also

reported socializing with friends and family members. Id. Dr. Bromley's ultimate assessment was

that Nunez had "fair" insight and that his prognosis remained "fair." Id. at 332. The ALJ discussed

this evidence in her decision and explained that Dr. Bromley's own treatment and examination

notes indicated that Nunez was "benefit[ting] from the medications and his panic attacks had

lessened." Id. at 30. The ALJ thus adequately explained how she considered the supportability and

consistency factors as it relates to Dr. Bromley's opinion.

Finally, the ALJ properly found that Dr. Ellis' finding of marked limitations was not

persuasive. Id. at 31. Dr. Ellis opined that Nunez had marked limitations in concentrating and

maintaining pace, as well as in interacting with others and that Nunez would miss more than three

workdays per month. The ALJ explained that Dr. Ellis' opinion was not consistent with the

treatment records from Drs. Schulte and Bromley and was also inconsistent with, and not supported

20

by, Dr. Ellis' own psychiatric evaluation of Nunez from August 2019. Id. During that evaluation,

although Nunez reported intrusive dreams, panic attacks, and social anxiety, Dr. Ellis found that

Nunez had full orientation, and "logical" and "linear" thought process. Id. at 729-31. Further,

Nunez reported compliance with his Lexapro and Atarax prescriptions and denied any adverse side

effects to the medications. Id. at 730. Ultimately, Dr. Ellis found that Nunez had no perceptual

disturbances or impaired concentration or attention, and reported that Nunez had "good" impulse

control and "fair" insight and judgment. Id. As the ALJ reasonably observed, Dr. Ellis' own

psychiatric evaluation revealed that Nunez remained mentally stable, his contrary opinion

notwithstanding. Id. at 29. The ALJ's discussion adequately explained how Dr. Ellis's opinion was

not consistent or supported by the record evidence. Id.

        As the ALJ explained in her decision, the underlying medical evidence shows that from

May 2018 to August 2019, Nunez's panic disorder improved as he continued to respond to

medication and treatment, and Nunez exhibited less anxiety and suffered fewer panic attacks.

During this period, Nunez remained under the ongoing treatment of Dr. Schulte, who noted these

improvements at monthly examinations. These improvements were also documented by Drs.

Bromley and Ellis in their examinations of Nunez. Contrary to Nunez's argument, the ALJ did not

disregard the longitudinal treatment records. Pl.'s Br. at 17. To be sure, those records showed that

Nunez's anxiety was persistent. But other evidence showed a sustained upward trajectory in

Nunez's condition due to treatment and medication, and that Nunez's symptoms were managed in a

way that still allowed him to engage in normal activities. In short, the ALJ's assessment of the

medical opinions is supported by substantial evidence, and therefore her determination must be

upheld even if other evidence in the record may suggest a contrary conclusion. See Bonet ex rel.

T.B. v. Colvin, 523 F.App'x 58, 59 (2d Cir. 2013) (summary order) ("[W]hether there is substantial

evidence supporting the [claimant's] view is not the question here; rather, we must decide whether substantial evidence supports *the ALJ's decision*.") (citations omitted; emphasis in original).

Nunez's arguments attacking the ALJ's determination are meritless. First, the ALJ did not ignore Nunez's diagnoses. Pl.'s Br. at 17-18. Indeed, she found that Nunez's severe impairments included agoraphobia with panic disorder and generalized anxiety behavior, R. at 25, but ultimately found that Nunez was not as functionally limited as the doctors opined, id. at 31. To the extent the record contained inconsistences or conflicting evaluations of Nunez's condition, it is within the ALJ's purview to resolve those conflicts. See Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) ("Genuine conflicts in the medical evidence are for the Commissioner to resolve.") (citation omitted); Herrera v. Comm'r of Soc. Sec., No. 20-CV-7910 (KHP), 2021 WL 4909955, at *9 (S.D.N.Y. Oct. 21, 2021) (upholding ALJ's determination which "noted and discussed" conflicting medical evidence and "arrived at a decision based on the record as a whole").

Nor did the ALJ substitute her judgment for that of Drs. Schulte, Bromley, and Ellis. Pl.'s Reply Br. at 1-2. Instead, the ALJ's findings reconciled the doctors' examinations and treatment notes with their final opinions. Additionally, the ALJ did not err, as Nunez argues, by discounting Dr. Schulte's opinion as to Nunez's inability to work, because this is a determination reserved to the Commissioner. Pl.'s Br. at 14. And while the ultimate determination of disability is indeed reserved to the Commissioner, Revi v. Comm'r of Soc. Sec., No. 16-CV-08521 (ER) (DF), 2018 WL 1136997, at *30 (S.D.N.Y. Jan. 30, 2018), report and recommendation adopted, 2018 WL 1135400 (S.D.N.Y. Feb. 28, 2018) (citations omitted), the ALJ's decision illustrates that she did not simply discount Dr. Schulte's opinion. As discussed, the ALJ explained why Dr. Schulte's opinion was not supported by, or consistent with, the underlying medical evidence. R. at 30-31.

Contrary to Nunez's argument, the totality of the record does not support a finding that what Nunez experienced were "transient" or isolated "periods of stability." Pl.'s Br. at 18. Instead,

as the ALJ concluded, the underlying record amply demonstrated that Nunez's condition had improved over a sustained period of time. See supra pp. 17-19. And, this improvement was documented by Drs. Schulte, Bromley, and Ellis, based on their respective observations of Nunez and Nunez's own statements regarding his condition. In her decision, the ALJ described how that evidence supported her findings that the opinions of Drs. Schulte, Bromley, and Ellis were not persuasive, citing specific medical facts and observations made by each doctor. R. at 30-31.

In sum, because the ALJ's decision reflects that she considered the supportability and consistency factors as they relate to the opinions of Drs. Schulte, Bromley, and Ellis, and because her findings are supported by substantial evidence, the weight the ALJ assigned to each opinion must be upheld.

2.   Substantial evidence supports the ALJ's RFC determination.

In her RFC determination, the ALJ found that Nunez's mental impairments imposed significant restrictions, but did not prevent him from performing a limited range of simple, unskilled work.[6] R. at 31. Accounting for Nunez's mental impairments, the ALJ stated that Nunez "cannot work at unprotected heights or around moving mechanical parts." Id. The ALJ also stated that Nunez "is able to perform the demands of work that requires him to understand, remember, and carry out instructions consistent with occupations that can be learned in up to 30 days." Id. The ALJ limited Nunez to a work environment with "occasional interaction with the public," but stated that he "remains able to interact appropriately with supervisors and co-workers." Id. Finally, the

---

[6] "Unskilled work" is defined by the Social Security regulations as "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. . .[A] person can usually learn to do [an unskilled] job in 30 days, and little specific vocational preparation and judgment are needed." See 20 C.F.R. § 404.1568(a); 20 C.F.R. § 416.968(a).

ALJ stated that Nunez "requires a setting that is goal-oriented versus requiring that he maintain[ ] a specific pace consistent throughout the day." Id.

Nunez asserts that there is "no linkage" between the ALJ's RFC finding and any evidence in the record, and that the ALJ erred because she did not cite to any "specific medical facts or persuasive non-medical evidence" in support of her RFC finding. Pl.'s Br. at 21. Further, Nunez states that the ALJ's finding is flawed because her conclusion conflicts with Dr. Bromley's finding of mild and moderate limitations, which the ALJ found persuasive, and that she failed to explain the conflict in her reasoning. Id. at 21-22. Defendant counters that evidence in the record supports the ALJ's RFC finding. Def.'s Br. at 26-27. Here, not only did the ALJ properly articulate her reasoning, but substantial evidence in the record supports the ALJ's RFC determination. She therefore properly crafted Nunez's RFC.

In assessing Nunez's RFC, the ALJ explicitly mentioned Nunez's previous mental evaluations and history of anxiety and panic attacks. R. at 31. Moreover, the evidence referred to by the ALJ indicates that Nunez benefited from medication and treatment, and that he appeared mentally stable and cooperative at numerous mental-status examinations. Id. For example, the ALJ noted that just a few months after starting Lexapro, Dr. Schulte reported that Nunez himself admitted to benefiting from treatment and the medication. Id. at 28. The ALJ noted, and the record supports, see supra pp. 17-19, that Nunez's condition improved and remained stable while taking Lexapro and while under the continued care of Dr. Schulte. R. at 28-29. The record also shows that from December 2018 to June 2019, Nunez was regularly attending group therapy sessions under the care of Karen Merns, Ph.D. as part of his treatment, throughout the course of which Nunez reported improvement in his anxiety. See, e.g., id. at, 337, 344 351, 352, 412, 418, 427, 444, 451, 458, 459, 466, 473, 474 481, 482.

The ALJ also described how Nunez's improvement was observed not only by Dr. Schulte, but also by other examining doctors. For example, the ALJ noted that in November 2018, Dr. Bromley observed that Nunez "had appropriate grooming, motor activities, speech, and . . . only 'mildly' impaired attention, concentration and memory," and that he described Nunez's prognosis as "fair." R. at 28. The ALJ also noted that a psychiatric evaluation by Solomon Miskin, M.D. in January 2019, revealed that Nunez's conditions were "unremarkable," with Dr. Miskin observing that Nunez "was neatly dressed, appropriately groomed fully oriented, and coherent," and "had grossly intact memory, calculation skills, and good insight and judgment." R. at 29. Additionally, the ALJ noted that a mental-status examination of Nunez by Dr. Merns in April to June 2019 revealed "improved anxiety and panic attacks, as well as concrete thought process and no evidence of suicidal or homicidal thoughts." Id. Finally, the ALJ noted that an August 2019 psychiatric evaluation by Dr. Ellis showed that Nunez "was mentally stable," and that he had "full orientation and logical thought process." Id. Collectively, the treatment notes from various doctors, spanning a period of approximately fifteen months, provide substantial evidence for the ALJ's RFC determination.

The ALJ also explained that evidence in the record supported Nunez's ability to perform basic daily activities, such as shopping at the store and using public transportation. R. 28. The ALJ pointed to evidence in the record showing that Nunez could perform daily personal-care activities, and that he appeared at many medical examinations appropriately groomed. Id. at 26. The ALJ also noted that there were no reported issues of Nunez interacting with medical staff, and that during his evaluations, doctors described him as "pleasant and cooperative." Id. The record also indicates that Nunez would leave his house to interact with family members, attend church, walk in the park, and attend weekly group therapy sessions with Dr. Merns and monthly examinations with Dr. Schulte. Id. at 56-57, 298, 309, 335, 337, 344, 346, 351, 352, 412, 414, 418, 421 427, 444, 451, 458, 459,

466, 473, 474, 481, 482, 654, 647, 663. Courts have found that a claimant's ability to perform similar basic activities can properly support an ALJ's determination that the claimant has an RFC to perform light work, subject to specified modifications. See Acevedo v. Comm'r of Soc. Sec., No. 21-CV-10621 (KHP), 2023 WL 1433648, at *13 (S.D.N.Y. Feb. 1, 2023) (finding that an RFC determination that limited the plaintiff to simple, routine, and repetitive tasks, a low-stress work environment, and occasional contact with others was consistent with mild to moderate limitations where the plaintiff was able to regularly take medication, able to shop, attend medical appointments and church, and sometimes use public transportation, even with some anxiety) (collecting cases); see also Cichocki v. Astrue, 729 F.3d 172, 178 (2d Cir. 2013) (upholding an RFC to perform light work that relied, in part, on the plaintiff's indication that she performed numerous daily tasks, such as walking her dogs and cleaning her house); Browne v. Comm'r of Soc. Sec., 131 F. Supp. 3d 89, 101 (S.D.N.Y. 2015) (upholding ALJ's conclusion that a plaintiff's could perform light work based on reports that the plaintiff could do household chores, go out alone and take public transportation, attend medical appointments several times per week, and walk for five blocks); Simmons v. Colvin, No. 13-CV-1724 (KBF), 2014 WL 104811, at *5-6 (S.D.N.Y. Jan. 8, 2014) (finding a plaintiff's testimony that she could walk several blocks and did her own cooking, cleaning, and laundry provided substantial evidence for an RFC finding which limited plaintiff to light work).

Contrary to Nunez's argument, Pl.'s Br. at 21-22, the ALJ correctly considered Dr. Bromley's findings that Nunez had mild to moderate limitations, which she found persuasive, in crafting Nunez's RFC, R. at 30. Dr. Bromley concluded that Nunez had mild to moderate limitations in understanding, remembering, and applying simple directions and instructions, using reasoning and judgment, interacting with others, sustaining concentration and performing tasks, and sustaining order routine and regular attendance. See id.; see also id. at 328-32. Consistent with

this conclusion, the ALJ limited Nunez to specific work conditions that reflected his limitations. Nunez has not shown that Dr. Bromley's finding of mild to moderate limitations requires a more limited RFC. See Martinez v. Comm'r of Soc. Sec., No. 13-CV-159 (KMK)(JCM), 2016 WL 6885181, at *14 (S.D.N.Y. Oct. 5, 2016), report and recommendation adopted, 2016 WL 6884905 (S.D.N.Y. Nov. 21, 2016) (concluding that an RFC finding of unskilled work was consistent with a consultative examiner's opinion that plaintiff was able to follow and understand directions, occasionally deal with members of the public, and relate to coworkers); see also Landers v. Colvin, No. 14-CV-1090S, 2016 WL 1211283, at *4 (W.D.N.Y. Mar. 29, 2016) (finding that an RFC of simple, repetitive, and routine work accounted for moderate limitations in maintaining regular attendance); Shannon v. Berryhill, No. 16-CV-06796, 2018 WL 6592181, at *3 (W.D.N.Y. Dec. 13, 2018) ("There is significant case law indicating that the ALJ's limitation of Plaintiff to 'simple, routine tasks' . . . accounts for her limitations for performing activities within a schedule and maintaining regular attendance.") (collecting cases). Additionally, the ALJ's RFC determination is consistent with Dr. Bromley's findings, though the ALJ was not required to directly reconcile her finding with Dr. Bromley's opinion, as Nunez suggests, Pl.'s Br. 21-22. See Landers, 2016 WL 1211283, at *4 ("[A]n ALJ need not call out every moderate limitation by name, provided that the RFC appropriately reflects such limitations."); see also Vecchio v. Comm'r of Soc. Sec., No. 20-CV-8105 (MKV) (SLC), 2021 WL 8013772, at *15 (S.D.N.Y. Dec. 1, 2021), report and recommendation adopted, 2022 WL 873175 (S.D.N.Y. Mar. 24, 2022) ("That the ALJ deemed only a portion of [a] medical opinion to be persuasive . . . was not an act of impermissible cherry-picking . . . because the ALJ explained that a portion of her opinion was unpersuasive because it is inconsistent with the totality of the medical evidence in the record, including unremarkable mental status examinations.") (internal quotation marks omitted).

After articulating the evidence supporting her conclusion, the ALJ tailored her RFC finding to account for Nunez's mental-health symptoms by limiting Nunez to low-stress work with only occasional decision making, and only occasional interaction with the public. R. at 31. The narrow tailoring of the ALJ's determination makes it apparent that the ALJ considered the entire record in crafting the RFC, which fully accounted for Nunez's impairments. See Anzola v. Berryhill, No. 18-CV-11217 (VSB) (DCF), 2019 WL 10630956, at *20 (S.D.N.Y. Dec. 20, 2019), report and recommendation adopted, 2020 WL 5646329 (S.D.N.Y. Sept. 21, 2020) (concluding RFC determination that included restrictions based on the plaintiff's limitations appropriately considered a medical opinion and was supported by substantial evidence); see also Matthew E. v. Saul, No. 19-CV-6877L, 2021 WL 695103, at *3 (W.D.N.Y. Feb. 23, 2021) (reasoning that where an ALJ narrowly tailored his RFC finding to account for plaintiff's mental-health symptoms by limiting plaintiff to simple, routine and repetitive tasks, low-stress work with only occasional decision making, and no more than occasional interaction with others, the RFC adequately accounted for plaintiff's moderate-to-marked stress-related limitations); DeJesus v. Comm'r of Soc. Sec., No. 20-CV-6815 (KHP), 2021 WL 5829766, at *11 (S.D.N.Y. Dec. 8, 2021) (affirming RFC determination where "[i]mportantly, the ALJ did not ignore but rather acknowledged [the plaintiff's] symptoms . . . but nevertheless found that the[y] were not so disabling as to preclude Plaintiff from working with appropriate limitations"). In short, the ALJ's RFC determination is supported by substantial evidence and therefore must be upheld.

3.   The ALJ properly assessed Nunez's subjective complaints about his symptoms.

Lastly, Nunez asserts that the ALJ failed to explain her reasoning with sufficient specificity as to how she assessed his subjective complaints about his symptoms. Pl.'s Br. at 23-25. Defendant counters that "[t]he ALJ provided sufficient analysis as to why Nunez's symptoms were not as severe, persistent or limited as he had alleged, by considering the regulatory factors." Def.'s Br. at

29. For the reasons explained below, the ALJ sufficiently explained her reasoning, and therefore did not err in assessing Nunez's subjective complaints about his symptoms.

The ALJ's decision reflects that she considered Nunez's subjective complaints concerning his anxiety and panic attacks, but, based on the medical record as a whole, determined that Nunez had responded to medication and that his condition had improved over the course of his treatment. R. at 28. At the August 2019 hearing, Nunez explained to the ALJ how his conditions had worsened, including that he experienced frequent daily panic attacks. Id. at 48-50. Nunez testified that due to his panic attacks, he had trouble taking public transportation and interacting with others. Id. at 53, 57. In his Function Report, Nunez described difficulty socializing with friends and family, and difficulty completing personal care, such as bathing. Id. at 214-21. During his psychological consultative examination, Nunez reported depressive mood, chronic panic disorder, and difficulty remembering and concentrating. Id. at 329. The ALJ acknowledged all these statements concerning Nunez's condition in her decision, id. at 26, but explained, citing to the record, that Nunez had responded well to his medications, and that his condition was improving. Id. at 28-31. Thus, the ALJ determined that while Nunez's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Nunez's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." Id. at 28.

The ALJ's decision demonstrates that she identified specific record-based reasons to support her determination, including findings from multiple doctors showing Nunez's sustained improvement, and Nunez's own statements indicating an improvement in his condition with medication and treatment. See Reices-Colon v. Astrue, 523 F. App'x 796, 799 (2d Cir. 2013) (affirming decision where substantial evidence supported ALJ's finding that plaintiff showed improvement following treatment); see also Hollaway v. Colvin, No. 14-CV-5165 (RA) (HBP),

2016 WL 96172, at *17 (S.D.N.Y. Jan. 8, 2016), <u>report and recommendation adopted</u>, 2016 WL 1275658 (S.D.N.Y. Mar. 31, 2016) (finding ALJ made a proper credibility determination and "did not completely reject plaintiff's complaints of pain or physical limitations, but rather found that given the overall record, plaintiff's medically determinable impairments would allow for the performance of 'a limited range of light work'").

Ultimately, the ALJ is "not required to accept the claimant's subjective complaints without question"; she is permitted to discount Nunez's testimony and subjective statements based on the record as a whole. <u>See</u> <u>Genier</u>, 606 F.3d at 49 (citations omitted). The ALJ appropriately did so here, and for the reasons discussed, her determination with respect to Nunez's credibility and her finding that Nunez could perform the limited range of simple, unskilled work was supported by substantial evidence. <u>See</u> <u>Johnson</u>, 563 F. Supp. 2d at 454 (S.D.N.Y. 2008) (holding that "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld").

**CONCLUSION**

For the foregoing reasons, Nunez's motion for judgment on the pleadings is **DENIED** and the Commissioner's cross-motion for judgment on the pleadings is **GRANTED**. The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 19 and 26.

DATED:      March 30, 2023
                 New York, New York


                                                        Respectfully submitted,

                                                        _____
                                                        VALERIE FIGUEREDO
                                                        United States Magistrate Judge

Copies to:

All counsel (via ECF)